# ORAL ARGUMENT HAS NOT BEEN SET

Appeal No. 13-5170

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

——————————————————

JANET ALLEN,

Plaintiff-Appellant,

v.

JEH JOHNSON, SECRETARY
Department of Homeland Security

Defendant-Appellee.

——————————

On Appeal from the United States District Court
For The District of Columbia
Civil No. 09-cv-02228
**(The Honorable John D. Bates)**

——————————————————

# APPELLANT'S BRIEF

——————————————————

David H. Shapiro
Ellen K. Renaud
SWICK & SHAPIRO, P.C.
1101 15TH Street, N.W.. Suite 550
Washington, DC 20005
(202) 842-0300
Email: ekrenaud@swickandshapiro.com
        dhshapiro@swickandshapiro.com

Counsel for Appellant

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In compliance with Federal Rule of Appellate Procedure 26.1 and local Rule 26.1, Appellant Janet Allen, makes the following disclosure stating that the following are all interested persons known to her:

1.    Janet Allen, appellant, who is a natural person.

2.    Ellen K. Renaud, attorney for the appellant, who is a natural person.

3.    David H. Shapiro, attorney for the appellant, who is a natural person.

4.    Janet Napolitano, appellee, who is a natural person sued only in her capacity as the Secretary of the United States Department of Homeland Security.

5.    Jeremy Simon, Assistant United States Attorney, attorney for the appellee, who is a natural person.

# TABLE OF CONTENTS

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **i**

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iii**

**STATEMENT OF JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**STATEMENT OF THE ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**STATEMENT OF THE FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**I.**      **Kathy Hill Sabotaged the Implementation of Ms. Allen's 2008 EEO Settlement.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**II.**     **Allen Complains That Ms. Hill Designed Her 2008 Performance Work Plan to Avoid a High Rating in Retaliation for Her EEO Activity** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

**III.**    **Following Her March/April Complaints of Discrimination, Ms. Hill Made it Impossible for Ms. Allen to Perform Her Work Successfully** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

**IV.**    **Hill Undermines Allen's Performance by Excluding Her from Meetings Essential to Her Job...** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

**V.**      **Without a Mid-year Review or Any Notice of Alleged Performance Deficiencies, Hill Reduced Allen's 2008 Performance Appraisal.** . . . . **14**

**SUMMARY OF ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

**I.**      **Standard of Review..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

II.   A Reasonable Juror Could Find that Ms. Hill Made Ms. Allen's Job
      More Arduous, Which Could Have Dissuaded a Reasonable Employee
      From Complaining of Discrimination.  . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      A.    There is Evidence Upon Which A Jury Could Reasonably
            Find that Ms. Hill Made Ms. Allen's Job More Arduous By
            Depriving Her of Resources and Excluding Her From
            Necessary Meetings.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      B.    The District Court Failed to Consider Whether the Combined
            Effect of the Agency's Actions Would Dissuade a Reasonable
            Employee From Engaging in Protected Activity.  . . . . . . . . . . . . 28

III.  A Reasonable Jury Could Find That Ms. Hill Acted with a
      Retaliatory Motive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      A.    A Reasonable Jury Could Find That Ms. Hill Began a
            Campaign to Undermine Ms. Allen Immediately After She
            Learned of Ms. Allen's Complaint of Retaliation  . . . . . . . . . . . 31

      B.    A Reasonable Jury Could Infer from the Late Appearance of Any
            Substantive Reasons for Excluding Ms. Allen from Essential
            Meetings That Ms. Hill Was Motivated by Retaliation.. . . . . . . 34

      C.    A Reasonable Jury Could Reject Ms. Hill's Reasons for
            Downgrading Ms. Allen's 2008 Performance Appraisal and
            Find That She Is Covering up a Retaliatory Motive.  . . . . . . . . 36

      D.    A Reasonable Jury Could Infer Retaliation From Ms. Hill's
            Failure to Follow Procedures Designed to Ensure Fairness
            and an Opportunity to Improve.. . . . . . . . . . . . . . . . . . . . . . . . . 38


      CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# TABLE OF AUTHORITIES

**Statutes:**

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291, 1294 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 2000e-et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Cases:**

*Adickes v. S.H. Kress & Co.,*
  398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Arrington v. United States*
  473 F.3d 329 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Brady v. Office of Sergeant at Arms,*
  520 F.3d 490 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 20, 37, 38

*Brown v. Mississippi Div. of Medicaid,*
  2010 WL 956166 (S.D.Miss. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Burlington Northern and Santa Fe Ry. Co. v. White,*
  548 U.S. 53 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 25, 27

*Celotex Corp v. Catrett,*
  477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*Che v. Mass. Bay Transp. Auth.,*
  342 F.3d 31 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Czekalski v. Peters,*
       475 F.3d 360 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*EEOC v. Sears Roebuck and Co.,*
       243 F.3d 846 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Farris v. Clinton,*
       602 F.Supp.2d 74 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Gleklen v. Democratic Congressional Campaign Committee,*
       199 F.3d 1365 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-32

*\*Hamilton v. Geithner,*
       666 F.3d 1344 (D.C. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

*Hill v. Kempthonre,*
       557 F.Supp.2d 58 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kachmar v. Sunguard Data Systems, Inc.,*
       109 F.3d 173 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
       475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*\*Mogenhan v. Napolitano,*
       613 F.3d 1162 (D.C.Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 28

*Ohal v. Bd. of Tr. Of the Univ. of the District of Columbia,*
       100 Fed. Appx. 833 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 25-26

*Phillips v. Collings,*
       256 F.3d 843 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 28

*Rochon v. Gonzalez,*
       438 F.3d 1211 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Salazar v. Washington Metropolitan Transit Auth.,*

401 F.3d 504 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Singletary v. District of Columbia*,
351 F.3d 519 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Texas Dep't of Cmty. Affairs v. Burdine*
450 U.S. 248 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Tyler v. RE/MAX Mountain States, Inc.*
232 F.3d 808 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Walker v. England,*
590 F.Supp.2d 113 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Washington Post Co. v. United States Dep't of Health & Human Srvs.,*
865 F.2d 320 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

* Denotes case upon which Appellant chiefly relies.

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 707 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*  This Court has jurisdiction to review the final judgment of the District Court pursuant to 28 U.S.C. §§ 1291, 1294.

## STATEMENT OF THE ISSUES

1.      In considering whether an employee has sufficient evidence to raise an inference of retaliatory motive at the summary judgment stage, may a district court disregard evidence of a pattern of antagonism following protected activity?

2.      Can a reasonable jury infer a retaliatory motive when a decisionmaker begins a course of antagonism against the Plaintiff just two and one-half weeks after learning of the plaintiff's EEO settlement?

3.      Can a reasonable jury infer that a decisionmaker harbored a retaliatory animus against the plaintiff where there is evidence that the decisionmaker refused to implement the terms of an earlier EEO settlement, and attached a document to the employee's performance appraisal making it obvious that they were the product of litigation, and refused to remove the indications of litigation, and then deprived the employee of the resources necessary to do her job, jeopardized the plaintiff's ability to participate in training, excluded her from emails and meetings essential to

1

her completion of duties, and refused to provide an explanation for such exclusion at her deposition but provided a detailed explanation in a declaration, and gave conflicting explanations for her rating the plaintiff poorly?

4.     Can a reasonable jury infer that exclusion from meetings that are central to the completion of a worker's duties, including her responsibilities as a Contracting Officer's Technical Representative, might reasonably dissuade that worker from making or supporting a charge of discrimination?

5.     Can a district court determine, at summary judgment, that a manager who fails to notify her subordinate of meetings within the subordinate's responsibility did not *intend* to exclude the subordinate from these meetings?

6.     Can a reasonable jury infer that the decisionmaker's contention that she rated the plaintiff's performance poorly based on a project she supervised was pretextual where the same decisionmaker praised the plaintiff's subordinate for the work she performed, under the plaintiff's supervision, on that same project?

7.     Can a reasonable jury infer a retaliatory motive when a decisionmaker first provides an explanation for her actions years after taking the action and ten months after refusing to provide an explanation during her sworn deposition?

## STATEMENT OF THE CASE

Plaintiff-Appellant, Janet Allen, filed her initial complaint against Defendant-Appellee on November 24, 2009. R. 1.  Ms. Allen contended that the Agency retaliated against her by depriving her of necessary resources to perform her job and excluding her from meetings.  Defendant-Appellee filed its first Motion to Dismiss and/or for Summary Judgment on March 10, 2010.  R. 8.  Allen opposed that motion on May 25, 2010.  R. 14.  On March 31, 2011, the District Court denied in part and granted in part, Defendant's motion to dismiss.  R. 18. Defendant again moved for summary judgment on December 14, 2012.  R. 37. The District Court granted that motion and entered judgment for defendant on May 6, 2013, R. 44. Allen timely filed her Notice of Appeal on June 5, 2013.  R. 46.

## STATEMENT OF THE FACTS

## I.    Kathy Hill Sabotaged the Implementation of Ms. Allen's 2008 EEO Settlement.

In 2006, Ms. Allen filed an EEO complaint against the Agency for discriminatory non-selection.  PX[1] 4 (Allen Decl., 2009) at 1.  In October 2007, Ms. Allen filed a complaint of constructive demotion due to unlawful retaliation. *Id.* at 1-2.  At the time, she held the GS-15 position of Director of Internal Controls in the Office of Assurance and Compliance ("OAC"), which is a division of the

---

[1]PX denotes a Plaintiff's Exhibit filed in support of Plaintiff's Memorandum in Opposition to Summary Judgment.

Immigration and Customs Enforcement ("ICE") agency within the U.S.

Department of Homeland Security ("DHS").  R. 37-2, Hill  Decl. at ¶ 6.  In

February 2008, Ms. Allen and DHS entered into an out-of-court agreement which

settled Ms. Allen's claims of unlawful discrimination and retaliation against the

agency.  PX 9 (Allen Decl., 2013) at ¶ 1.

      Kathy Hill, the Director of OAC, and Ms. Allen's first-line supervisor,

learned about Ms. Allen's protected activity when she was made responsible for

implementing the terms of the agreement – sometime at the very end of February

2008.  R. 37-2, Hill Decl. at ¶ 2, 6, 42; PX 3 at 40.  Ms. Hill was responsible for

making sure that Ms. Allen's leave was reinstated, that she was provided with back

pay and a lump sum payment, and that she received "Outstanding" performance

appraisals for fiscal years 2005-2007 in accordance with the settlement agreement.

PX 3 (Hill deposition) at 39-40.

      On March 18, 2008, just two and one-half weeks after learning about Ms.

Allen's EEO activity, Ms. Hill issued Ms. Allen's three appraisals with no narrative

or comments to justify the "Outstanding" rating, thus undermining their legitimacy

to anyone reviewing them.  PX 10 (2005-2007 appraisals, signed March 18, 2008).

Agency policy requires reviewing officials to provide narrative justifications for

"Outstanding" ratings.  *See* PX 2 (ICE Training Performance Reviews) at 6 (noting

that rating official must provide comments to justify ratings above or below

Achieved Expectations); *see also* PX 6 (Jones deposition) at 29 (testifying that

performance reviews should not be left blank under progress review summaries as

Ms. Allen's was).

     In addition, Ms. Hill effectively announced to anyone looking at Ms. Allen's

reviews that the "Outstanding" ratings were the product of litigation.  She attached

a document to each appraisal that was clearly labeled "ALAN BANOV &

ASSOCIATES," the law firm representing Ms. Allen in her EEO case.  PX 3 at 39;

*id.* at 42 (Ms. Hill admitting this was not the regular way in which performance

reviews were done), PX 7 (Keenan deposition) at 48-49.("Q: And if you found out

Alan Banov was a lawyer would that raise questions?  A: Yes, it would.").  Ms.

Allen told Ms. Hill that the reviews did not conform with regulatory requirements

and made it obvious they were the product of litigation. PX 4 (4/22/2009 Allen

declaration) at 2; *see also* PX 6 (Jones deposition) at 31 (recalling that Ms. Allen

had concerns that the performance reviews did not look like what she would have

expected, and that these were "not what a typical performance assessment would

look like").  Ms. Hill refused to change the reviews even though she admitted that

she did not ensure that the appraisals complied with agency regulations. *Id.* at 76-

77 (Ms. Hill admitting she made no attempt to ensure compliance with agency

regulations).

## II.  Allen Complains That Ms. Hill Designed Her 2008 Performance Work Plan to Avoid a High Rating in Retaliation for Her EEO Activity.

On March 28, 2008, Ms. Allen complained to Ms. Hill that because of her prior EEO activity, her performance goals were drafted in such a way as to preclude her from being able to achieve anything other than a mediocre or unacceptable performance rating.  PX 4 at 21; PX 8. On April 24, 2008, Ms. Allen communicated to Ms. Hill that she believed the final version of her performance plan was also retaliatory.  *Id.*  On May 23, 2008, Ms. Hill presented Ms. Allen with a slightly revised plan, stating that she had included language in it "per legal counsel."  *Id.*

## III.  Following Her March/April Complaints of Discrimination, Ms. Hill Made it Impossible for Ms. Allen to Perform Her Work Successfully.

Following Ms. Allen's complaints in March and April 2008 to Ms. Hill that her performance plan was retaliatory, Ms. Hill began a campaign to frustrate Ms. Allen's ability to do her job.  As early as April 8, 2008, Ms. Hill deprived Ms. Allen of the resources necessary to complete her responsibilities on the improper payment testing.  PX 4 at 5.  Ms. Allen alerted Ms. Hill that it was unreasonable to expect her staff of three employees and four contractors to complete all of the work required for the improper payment testing program, but Ms. Hill did not even

address her concerns.  PX 4 at 5.  When Ms. Allen requested additional staff, Ms.

Hill refused to even respond to the request and thus denied her adequate staff to

accomplish the goal.  *Id.* at 5, 7 ("Ms. Hill diverted scarce resources from the high

priority internal control testing to an activity that had not been previously

identified by her.").  Indeed, Ms. Hill lowered Ms. Allen's 2008 performance

rating, in part, because the deadlines for the improper payment testing had to be

extended.  PX 1 at 15.

In June 2008, Ms. Hill ignored Ms. Allen's request to be nominated for the

ICE Fellows Program.  PX 4 at 19-20.  Then in July, Ms. Hill failed to timely

submit a recommendation for Ms. Allen to participate in the Federal Executive

Institute.  *Id.* at 11.

Ms. Allen was also responsible for establishing, assessing, correcting, and

reporting on internal financial controls, which was referred to as A-123 internal

control testing.  R. 37, Defendant's Statement of Material Facts ("SMF") 11. Ms.

Allen's responsibilities included overseeing the contract work of

PriceWaterhouseCoopers as they identified internal payment control deficiencies.

SMF 12.  Ms. Allen was the Contracting Officer's Technical Representative

7

("COTR") for that contract.[2]  PX 4 at 15.  In August, Ms. Hill, without any

discussion or input from Ms. Allen, decided to re-direct contracting staff away

from this task.  PX 4 at 5.

On September 22, 2008, Ms. Hill directed Ms. Allen to cease all direct

communication to DHS staff, and to copy her on any email communications with

them.  PX 4 at 15-16.  This included matters relating to PriceWaterhouseCoopers

("PWC"), even though Ms. Allen was the COTR for this contract. Ms. Hill told

Ms. Allen to consult with her before having any such communications, but Ms.

Hill never made herself available for such consultation.  *Id.*  As such, Ms. Hill's

directive effectively forced Ms. Allen to lose contact with the DHS staff regarding

a contract for which she was responsible.  *Id.*  Ms. Hill never gave Ms. Allen any

reason or rationale for the restriction.  *Id.* at 16.  While Ms. Hill restricted Ms.

Allen's communications with the Department, she allowed Ms. Allen's

subordinates to have frequent contact with Department officials.  *Id.*

---

[2]A COTR is the Contracting Officer's Technical Representative on a contract.  As COTR for the PWC contract, Ms. Allen was responsible for overseeing and directing the work of PWC on the A-123 internal control testing. PX 4 at 12; PX 3 at 128, *see also* PX 6 (Jones deposition) at 69, 87 (testifying that as the COTR, Allen was "responsible for directing the work of a contractor within the scope of work.").

**IV.  Hill Undermines Allen's Performance by Excluding Her from Meetings Essential to Her Job.**

In addition to depriving Ms. Allen of necessary resources to do her job, Ms. Hill frustrated Ms. Allen's ability to do her job by excluding her from meetings that were central to her responsibilities.  For example, OAC contracted with PWC to provide A-123 support services.  PX 4 at 12.  Ms. Allen was in charge of this project and was the COTR on the contract.  PX 3 at 128-129.  However, Ms. Hill excluded Ms. Allen from meetings regarding A-123 implementation. PX 3 at 128-129.

Indeed, Ms. Hill regularly conducted meetings–without Ms. Allen– with the PWC contractors.  PX 5 at 33-34; PX 5 at 68-69.  This not only made it more difficult for Ms. Allen to do her job, it violated the terms of the agency's contract with PWC because Ms. Hill was giving the contractors technical direction and under PWC's contract with the agency, Ms. Allen as COTR or the contracting officer was required to be present if PWC's performance under the contract was to be discussed, or if an agency representative was giving them technical direction. PX 5 at 76-77.

Ms. Hill excluded Ms. Allen from a meeting with contractor Diana Neal of PWC on or around November 5, 2008.  PX 5 at 75.  The PWC contractors advised Ms. Allen that the purpose of these meetings was to discuss PWC's progress under

9

its contract, and that Ms. Hill was giving PWC conflicting technical direction.  PX

5 at 76-79.  The PWC contractors were concerned, because they were not permitted

to have such discussions without the COTR (Ms. Allen) or the contracting officer

being present.  PX 5 at 79-80.  Because PWC contractors were complaining to Ms.

Allen that Ms. Hill was engaging in these improper meetings, Ms. Allen

emphasized to Ms. Hill that under the contract, the COTR's presence was required

to insure that the direction given to the contractors was consistent with the terms of

the contract.  PX 5 at 33-34.

However, Ms. Hill continued to meet with PWC contractors regarding their

work.  In 2009, Wendy Morris, the manager of the PWC on-site team, came to

Allen with concerns that Ms. Hill was meeting with her without Ms. Allen (the

COTR) present.  PX 5 at 95, *id.* at 101.  Ms. Morris stated that Ms. Hill regularly

requested meetings with her (Morris) to discuss status of work being performed

under the PWC contract without having the COTR present. *Id.* at 96.  While Ms.

Hill has claimed that the purpose of these recurring meetings with PWC was to

discuss future business, a jury could conclude that she was actually discussing

PWC's progress on current tasks.  *See* R. 37-2, Hill Decl. at ¶ 39 (admitting that

she sometimes discussed PWC's progress on current tasks).

Ms. Hill also excluded Ms. Allen from meetings with contractors from

10

Deloitte & Touche regarding A-123 internal controls remediation.  PX 5 at 54-61;

72-74 (testifying about specific internal controls remediation meetings from which

Ms. Hill excluded her); *id.* at 68 (testifying regarding a November 6, 2008, meeting

from which Ms. Hill excluded her).  Ms. Allen was directly responsible for the

internal testing of controls and, as such, it made sense for her to provide input in

meetings regarding the remedy for the deficiencies she and her team identified.  PX

9 at ¶ 14 (explaining that her role in identifying deficiencies enabled her to

"explain the nature of the deficiencies, provide clarification, resolve

misunderstandings, and advise on actions that were needed to address them").  Ms.

Allen was also responsible for assessing the effectiveness of remediation plans.  *Id.*

 Although Ms. Hill prevented Ms. Allen from participating in meetings about

remediation, Deloitte contractors often approached Allen for technical advice. PX

5 at 23-24.  After Ms. Hill departed from ICE, Ms. Allen was able to act as a

regular participant in remediation meetings.  PX 9 at ¶ 14.

    Ms. Hill also excluded Ms. Allen from meetings with Mike Wetklow, the

Director of Internal Controls Program Office at DHS Headquarters.  PX 5 at 89-91;

PX 14; PX 15.  Ms. Hill excluded Ms. Allen from a meeting she held with Mr.

Wetklow on November 21, 2008 in which they discussed internal control activities

for fiscal year 2009.  *Id.* at 89; PX 14.  At that meeting, Ms. Hill discussed

11

changing certain internal control testing and obtaining a statement of work

modification on the contract with PWC, a contract on which Ms. Allen was the

COTR.  PX 14.  Ms. Hill also discussed the improper payment testing with Ms.

Allen's subordinate, Ms. Crane.  PX 14.

Ms. Allen was responsible and rated for her management of the improper

payment testing function at OAC.  Yet, Ms. Hill excluded her from meetings

regarding this function as well.  Ms. Hill met with Ms. Allen's subordinate,

Melissa Crane to discuss the improper payment program, and excluded Ms. Allen

on or around November 25, 2008.  PX 5 at 91.  Ms. Hill also excluded Ms. Allen

from a meeting with Bill Mason, the project leader for the improper payment

initiative for all components within DHS.  *Id.* at 86-87.

Ms. Hill also excluded Ms. Allen from meetings regarding the Senior

Advisory Team ("SAT") with contractors from Deloitte, including a meeting of

December 5, 2008.  PX 3 at 134-136.  At her deposition, Ms. Hill admitted that the

substance of this meeting was under Ms. Allen's purview, and was unable to

provide any explanation as to why she excluded Ms. Allen from this meeting.  *Id.*

at 14-17 ("I don't know.").  The SAT was "a very high level kind of thing."  PX 6

(Jones deposition) 82.  Yet, Lois Jarvis, who was a GS-13 or 14 was invited and

Ms. Allen was not, even though she was a GS-15.  PX 6 (Jones deposition) at 76,

12

*see also id.* at 80 (advising that his testimony relating to a "SAD" meeting invitation was probably a typo which should have read "SAT," and that the testimony he had given related to the SAT meeting).

At her deposition, Ms. Hill refused to provide any explanation for excluding Ms. Allen from meetings on these programs for which Ms. Allen was responsible. Ms. Hill simply repeated her statement that this was at her discretion, but she gave no reason for using that discretion to keep Ms. Allen out of the meetings, even after counsel made several attempts to elicit a substantive explanation from her. *Id.* at 129 ("Because I'm ultimately responsible, and it was my decision on who attended the meeting...Because it's my discretion on who I have at the meetings."), 130 ("As director of the office, it is my prerogative on who I invite to the meetings...Because of the level of the meetings, I would choose who – I would decide who was appropriate to attend the meetings or not."), 132  ("Because I have the prerogative on who I take to the meetings, depending on who's at the meetings and the purpose of the meetings."), 133-134 ("Because they were meetings with my supervisor, and it was my decision not to include her," then admitting that some of the meetings did not include her supervisor).

After repeated deposition questions by Plaintiff's counsel calling for a substantive explanation for these exclusions, Ms. Hill claimed that it was because

13

someone else had scheduled these meetings and that she did not pay close attention to the invitee list.   PX 3 at 166 ("Because I may not have opened – I may not have been the one that initiated the invite, and I didn't necessarily look at all the attendees.").

However, the declaration by Ms. Hill, prepared as an attachment to Defendant's motion for summary judgment, provides some very specific and detailed explanations for Ms. Hill's decision to exclude Ms. Allen from several meetings – none of which include failing to look at the invitee list.  R. 37-2, Hill Decl. at ¶¶ 33-41.  For some meetings, Ms. Hill claims that Ms. Allen was not needed, and some she claims did not occur.  *Id.*  Neither of these explanations were provided by Ms. Hill when she was questioned on this point at her deposition.

**V.     Without a Mid-year Review or Any Notice of Alleged Performance Deficiencies, Hill Reduced Allen's 2008 Performance Appraisal.**

Ms. Hill's 2008 evaluation of Ms. Allen rated Ms. Allen at the second lowest rating available: "Achieved Expectations."  Ms. Hill downgraded Ms. Allen, in part, based on the false allegation that Ms. Allen failed to collaborate effectively with the Burlington Finance Center ("BFC") regarding the "Test of Design."  PX 1 at 14-15.  Ms. Hill acknowledges that Ms. Allen identified "possible deviation from federal accounting standards" in the Test of Design, but faults Ms. Allen for not communicating with the BFC, whom she incorrectly labels the "subject matter

14

experts" on this issue.  *Id.*  On this element, Ms. Hill also faults Ms. Allen for a delay in the Tests of Operating Effectiveness when, in fact, the delay was due to a significant expansion in the scope of the assignment midway through the project. PX 9 at ¶ 5.  Moreover, prior to the 2008 evaluation, Ms. Hill never told Ms. Allen that she lacked oversight or coordination with the BFC.  *Id.*

With regard to her third performance goal, Ms. Hill rated Ms. Allen as "Achieved Expectations" for her work overseeing the IPIA testing, alleging that the deadline had to be moved because of Ms. Allen's "lack of coordination" with the finance center, her failure to ensure they were receiving documents timely, and her failure to foresee this problem.  Ms. Hill never mentioned to Ms. Allen any problems with her oversight of the IPIA testing until this evaluation.  PX 9 at ¶ 6. Ms. Hill praised the team's work on the IPIA testing including Ms. Allen's subordinate, Melissa Crane, who has no history of EEO activity.  *Id.* at ¶¶ 6-7.  Ms. Crane was directly responsible for communication with the finance centers who performed the IPIA testing.  *Id.*  Thus, both Ms. Crane and Ms. Allen bore responsibility for coordination with the finance centers on IPIA testing.  *Id.* at ¶¶ 5 and 8.  Yet, Ms. Hill actively encouraged Ms. Crane's rating as "Achieved Excellence" (the highest rating) and a "nice cash award" because of her excellent work on the IPIA testing, while at the same time using the alleged lack of

15

coordination with the finance centers as the reason for downgrading Ms. Allen's performance rating. *Id.* at ¶ 7.

Furthermore, Ms. Allen did foresee difficulty meeting the deadline and had alerted Ms. Hill to her concern. As early as April 2008, Ms. Allen told Ms. Hill that additional resources were needed to complete the testing for improper payments. PX 4 at 5. She followed up several times with Ms. Hill, but Ms. Hill did not respond to any of her requests. PX 4 at 5.

Ms. Hill faulted Ms. Allen for not having quality assurance ("QA") test results available during a conference call with Bill Mason and humiliated her in front of her colleague. PX 9 at ¶ 16. However, Ms. Hill knew that these QA results were not yet available, because Ms. Allen had brought this to her attention via email prior to the conference call. PX 13.

The narrative Ms. Hill prepared for Ms. Allen's 2008 performance review included numerous other criticisms that Ms. Hill had never mentioned before. PX 4 at 13. Indeed, Ms. Hill failed to give Ms. Allen a mid-year review, which would have been the ideal opportunity for Ms. Hill to give Ms. Allen a warning if she truly needed to improve her performance. PX 3 at 82. According to Manager Alexander Keenan, supervisors at ICE are expected to give their subordinates mid-year ratings for the very purpose of ensuring that they understand how the

16

supervisor views their performance and to avoid surprises in the annual review. PX 7 (Keenan deposition) at 36-37.

At his deposition, Mr. Jones, who was Ms. Hill's supervisor, testified that Ms. Allen should not expect to receive the highest rating. PX 6 at 51. According to Jones, ICE implemented a new rating system beginning with the fiscal year 2008 performance reviews, which was supposed to be more objective and specific, and to produce lower ratings. *Id.* at 53. However, it turned out that no employees were rated at the lowest rating level, which means that Ms. Allen's rating was one of the lowest given. *Id.* at 53. Further, Mr. Jones had no knowledge about performance appraisals at ICE prior to fiscal year 2009. *Id.* at 43. Mr. Jones testified that he believed Ms. Allen would have thought a high rating to have been automatic. *Id.* at 53-54.

Following the departure of Ms. Hill from OAC, many of Ms. Allen's duties and responsibilities that were transferred by Ms. Hill were returned to her. In 2010, Ms. Allen's new rating official evaluated her performance at the level of "Achieved Excellence" and she received a monetary award of $4000. DX 6 at ¶ 1 (plaintiff's response to interrogatory 1).

## SUMMARY OF ARGUMENT

In February 2008, Janet Allen settled claims of discrimination that she had

17

brought against her employer, the Immigration and Customs Enforcement ("ICE")
agency which is part of the U.S. Department of Homeland Security.  Among other
things, the terms of the settlement provided that Ms. Allen should receive
"Outstanding" performance evaluations for the 2005-2007 rating periods.  Ms.
Allen's immediate supervisor, Kathy Hill, was charged with implementing the
terms of a settlement agreement.  Instead of allowing Ms. Allen the benefits of her
settlement, Ms. Hill retaliated against her by implementing its terms in a way to
thwart Ms. Allen.  When Ms. Allen complained about this new course of reprisal,
Ms. Hill escalated by placing artificial restrictions on Ms. Allen that made it
difficult for Ms. Allen to carry out her duties, such as excluding her from meetings
that were essential for her job, and undermining Ms. Allen's authority among her
colleagues and subordinates.  In addition, after having been forced by the
settlement agreement to issue Ms. Allen an "Outstanding" rating in 2007, Ms. Hill
manipulated Ms. Allen's performance work plan so that she could justify giving
Ms. Allen a rating just above unacceptable in 2008.

Despite these facts, the District Court dismissed Ms. Allen's complaint
concluding that Ms. Hill had valid reasons for how she treated Ms. Allen and that
her treatment of Ms. Allen was not sufficiently harsh to dissuade an employee such
as Ms. Allen from bringing a charge of discrimination.  This finding was error

18

because a jury could reasonably conclude that Ms. Hill's actions altered the terms and conditions of Ms. Allen's employment by making her job more difficult and lowered her performance evaluation without justification. Moreover, there is evidence upon which a reasonable jury could reject as pretextual Ms. Hill's claim that as Ms. Allen's supervisor she was free to exercise her "discretion" as she pleased (as well as subsequent justifications that were first advanced years after the decision). In addition, based upon evidence of temporal proximity between the settlement of Ms. Allen's prior claims and Ms. Hill's course of harsh treatment, a reasonable juror could find that Ms. Hill's actions were done to punish Ms. Allen for making a charge of retaliation.

For these reasons, the District Court's dismissal of Ms. Allen's claims at summary judgment should be reversed.

## ARGUMENT

### I.    Standard of Review.

Summary judgment is proper only against "a party who fails to make a showing sufficient to establish the existence of any element essential to that party's case, and on which that party will bear the burden of proof at trial." Fed. R. Civ. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986). This Court reviews the District Court's grant of summary judgment *de novo*, viewing the evidence in the

19

light most favorable to the non-moving party and drawing all reasonable inferences accordingly. *Salazar v. Washington Metropolitan Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005) (internal citation omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (internal citations omitted).  In determining whether a reasonable trier of fact could find for the nonmovant, the court must consider all of the evidence in the light most favorable to the nonmovant, and draw all reasonable inferences in his favor. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006).  In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court made clear that disputes over facts, which might affect the outcome of the suit under the governing law, will preclude the entry of summary judgment.  477 U.S. 242, 248 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, a motion for summary judgment cannot be granted).

20

It is axiomatic that the evidence presented must always be construed in favor of the party opposing the motion for summary judgment, and it is that party who is also to be accorded the benefit of all favorable inferences that can be drawn from the record evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Washington Post Co. v. United States Dep't of Health and Human Srvs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, a district court's decision to grant summary judgment must be reversed. *Matsushita*, 475 U.S. at 587.

## II.     A Reasonable Juror Could Find that Ms. Hill Made Ms. Allen's Job More Arduous, Which Could Have Dissuaded a Reasonable Employee From Complaining of Discrimination.

### A.     There is Evidence Upon Which A Jury Could Reasonably Find that Ms. Hill Made Ms. Allen's Job More Arduous By Depriving Her of Resources and Excluding Her From Necessary Meetings.

In a case of retaliation, the Court must consider the combined effect and context of the agency's actions, namely Kathy Hill's treatment of Ms. Allen, and determine whether she was subjected to sufficiently adverse treatment that "might well have dissuaded a reasonable worker from making or supporting a charge of

21

discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006) (internal citations omitted); *see also id.* at 69 ("[T]the significance of any given act of retaliation will often depend upon particular circumstances. Context matters."); *Hill v. Kempthonre*, 557 F.Supp.2d 58, 67 (D.D.C. 2008) (determining that the "combined effect" of three employer actions could dissuade a reasonable worker from engaging in protected activity). The record contains sufficient evidence for a reasonable jury to find that Ms. Allen suffered actionable, unlawful retaliation by the agency.

To determine whether Ms. Allen might have been dissuaded from making a complaint of discrimination, the Court must consider the totality of the agency's actions toward her. *See Phillips v. Collings,* 256 F.3d 843, 849 (8th Cir. 2001) ("[W]e consider the cumulative effect of [the employer's] discriminatory actions rather than determining whether any individual action upon which the claim relies was sufficiently adverse."); *see also Mogenhan v. Napolitano,* 613 F.3d 1162, 1166 (D.C.Cir. 2010) (examining two of the defendant's actions "in combination" and determining that the plaintiff met the *Burlington Northern* standard for materiality). In *Burlington Northern and Sante Fe Ry. Co. v. White,* the Supreme Court held that making an employee's duties "more arduous" in retaliation for engaging in protected activity can be "materially adverse to a reasonable

22

employee." 548 U.S. at 70-71. The Supreme Court also noted that exclusion from meetings may cause sufficiently material harm to be actionable. *Id.* at 69 ("Excluding an employee from a weekly luncheon that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.").  Likewise, excluding an employee from meetings, and thereby making her work harder, is actionable.  *See, e.g. Brown v. Mississippi Div. of Medicaid*, 2010 WL 956166, *3 (S.D.Miss. 2010) (holding that Plaintiff created a triable issue of fact regarding whether her exclusion from meetings might have dissuaded a reasonable employee from complaining of discrimination based on her testimony alone that the exclusion from meetings made her job more difficult to perform).  Here, the combined effect of depriving Ms. Allen of resources, staff, and training, and excluding her from necessary meetings and communications made her job more arduous.

A reasonable jury could find that Ms. Hill required Ms. Allen to perform her duties without the resources necessary to do so at the same time that she burdened Ms. Allen with multiple and duplicative, same-day requests; interfered with Ms. Allen's ability to communicate with DHS staff; refused to provide the supervisor portion of Ms. Allen's Federal Executive Institute ("FEI") application, though FEI training was required by Ms. Allen's settlement agreement; refused to allow her to

participate in DHS-sponsored classes to obtain training she needed to perform her duties; and excluded her from numerous meetings relevant to her assigned duties. Specific examples before the District Court were:

- "On August 8, 2008, Ms. Hill informed me that she and Bill Mason, DHS HQ, had agreed that certain changes in the A-123 contract were needed to direct contractor resources to higher priority activities" (after Ms. Allen had requested additional necessary resources from Hill and Hill disrupted Ms. Allen's allocation of duties among Ms. Allen's subordinates.); PX 1 at 5.

- "Notwithstanding that it was the responsibility of the contractor to track documentation requests for internal control testing, I informed Ms. Hill that her diversion of my staff resources had left me with inadequate resources to track the vendor's documentation requests. . .  Ms. Hill diverted scarce resources from the high priority internal control testing to an activity that had not been previously identified by her." PX 1 at 7;

- "On September 22, 2008...Ms. Hill instructed me not to provide further comments to DHS on certain documents prepared by PWC until she had discussed any issues with me.  However, Ms. Hill was never available to discuss any issues with me, and, thus, her directive essentially halted my verbal communications with DHS." PX 1 at 15.

- Hill assigned Ms. Allen's immediate subordinate to participate in a DHS audit working group without consulting or informing Ms. Allen, in contravention of the practice at DHS. PX 1 at 33.

- Hill undermined Allen's authority such that program offices felt free to not respond to her requests for documentation.  PX 9 at ¶ 21.

The combined effect of the agency's actions was to make Ms. Allen's duties much harder to perform and may therefore have dissuaded a reasonable employee from evoking her right to the EEO process. *See Burlington,* 548 U.S. at 69.

This Court's unpublished decision in *Ohal v. Bd. of Tr. Of the Univ. of the District of Columbia* supports the proposition that denying adequate staff to a senior manager is materially adverse and supports a claim of retaliation.  100 Fed. Appx. 833 (D.C. Cir. 2004).  In *Ohal*, the employee complained that two of his employees were not replaced and that his supervisor unilaterally fired another of his employees, assigned work to his subordinates and sometimes signed his employees' leave slips in retaliation for his prior EEO activity.  *Id.* at 834.  The D.C. Circuit held that these facts, if proven, would constitute an adverse employment action.  *Id.*  Similarly, Ms. Allen has alleged that on several occasions, Hill deprived her of the resources she needed to perform her duties and that she interfered with her ability to interact with her subordinates and contractors.  Ms.

25

Allen's job, like Mr. Ohal's, became much more difficult as a result of her

supervisor's discrimination.  Because these facts are substantially similar, this

Court should reverse the dismissal by the District Court so that a jury can weigh

the evidence and determine whether these actions might deter a reasonable

employee such as Ms. Allen from exercising her Title VII rights. *See Rochon v.*

*Gonzalez*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) ("In our view, a plaintiff must

show that a reasonable employee would have found the challenged action

materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." (internal

quotations omitted)).

Ms. Allen also alleged that the agency refused to recognize or reward her for

her significant and longstanding contributions to the invoice consolidation project,

but instead conferred recognition and cash awards on other staff members whose

contributions were less significant than Ms. Allen's.  PX 1 at 14-15 ("On August

26, 2008, 2 individuals [f]rom the Burlington Finance Center were recognized by

the Assistant Secretary of ICE for their efforts relating to the invoice consolidation

project…I never received any recognition for my significant contribution to the

invoice consolidation project or for the strategies that I developed in 2005 to

resolve the agency's long standing material weaknesses in financial

26

management...]").

The Supreme Court's decision in *Burlington* also supports a finding that a jury should decide whether Hill's actions were sufficiently adverse. There, the Court held that a reasonable juror could find that assigning an employee "more arduous" tasks can be "materially adverse to a reasonable employee," even when "the former and present job duties fall within the same job description." *Burlington*, 548 U.S. at 70-71. The employee in *Burlington*, a forklift operator, was assigned to perform only "track labor duties" which were "more arduous and dirtier" than her former duties. 548 U.S. at 70-71. Similarly, Ms. Allen's job was made more arduous when she was denied access to adequate resources and given impossible deadlines. In the context of a GS-15 level management position, this is "more arduous and dirtier" than her job would have been absent retaliation. *Id.* ("more arduous" tasks can be "materially adverse to a reasonable employee," even when "the former and present job duties fall within the same job description.").

**B.     The District Court Failed to Consider Whether the Combined Effect of the Agency's Actions Would Dissuade a Reasonable Employee From Engaging in Protected Activity.**

The District Court erred in analyzing the materiality of the actions taken against Ms. Allen by considering her exclusion from meetings, standing alone and then concluding it was not materially adverse. *See* Mem. Op. at 16 - 25. In determining whether a person may be dissuaded from taking action that would trigger a series of negative consequences, the combined effect of those actions must be considered together. *See Phillips,* 256 F.3d at 849; *Mogenhan,* 613 F.3d at 1166.

The District Court also improperly resolved a question of fact by holding that Ms. Allen was not "excluded" from any meetings because she could have invited herself to the meetings. Mem. Op. at 6. The facts on this issue are in dispute. First, Ms. Allen has testified that she could not have invited herself to several of these meetings because she often did not know about that a meeting had occurred until after the fact. PX 9 at ¶ 23. In her affidavit before the District Court, Allen identified six specific meetings in her areas of responsibility from which she was excluded that she did not know about until after the fact. PX 4 at 24 (Allen, the Director of Internal Controls, was excluded from the November 6, 2008 meeting to discuss the history of the internal controls program; "I didn't even know

28

about the meeting until after the fact."); *id.* at 25 (Ms. Allen, who was responsible for the oversight and management of the Senior Assessment Team, was excluded from a December 5, 2008 meeting to discuss the Structure and Vision of the Senior Assessment Team; "I didn't even know about the meeting until after the fact and likely was excluded from other related meetings."); *id.* at 26 (Allen was excluded from November 6, 2008, meeting to discuss findings from the A0123 studies that her group completed; "I didn't even know about the meeting until after the fact and may have been excluded from other related meetings."); *id.* a 27-28 (Allen, the Director of Internal Controls, was excluded from the January 9, 2009, meeting to review the internal control presentation; "As with other meetings, I didn't know about this one either until after the fact and may have been excluded from other related meetings."); *id.* at 28-29 (Allen was excluded from a meeting between Ms. Hill and the contractor for the A-123 activities, for which Allen serves as the COTR; Allen did not learn about this meeting until after it took place); *id.* at 29-30 (Allen was excluded from a November 12, 2008, meeting with the contractor for the A-123 contract, of which Allen is COTR; Allen learned of the meeting in an email after it had taken place).

Second, a reasonable jury could infer from Ms. Hill's testimony that any request by Ms. Allen to attend a meeting to which Ms. Hill had not invited her

would have been futile:

> Q. Did you schedule or attend any meetings regarding the A123 program without including Ms. Allen?
> A. Yes.
> Q. Why?
> A. Because I'm ultimately responsible, and it was my decision on who attended the meetings.

PX 3 at 128-29.  Thus, contrary to the District Court's conclusion that Ms. Allen was free to invite herself to meetings she thought were necessary, a jury could find, based on Ms. Hill's sworn testimony, that it was Ms. Hill's view that decisions on who could attend these meetings were hers alone to make. *See also* PX 3 at 134 ("it was my decision not to include her.").

Finally, the District Court's conclusion that Ms. Allen proffered no evidence of tangible harm from the exclusion from meetings misses the point.  *See* Mem. Op. at 7 ("Because Allen has offered no evidence of any tangible impact (let alone direct economic harm) from her non-presence at meetings or from any resulting confusion, she has not shown that exclusion from meetings would amount to an adverse action.").  To the contrary, Allen has developed evidence that the contractors complained to her that Hill had been communicating with them outside of Allen's presence in violation of the contract and also complained to Ms. Hill about Ms. Allen.  Pl.'s Ex. 9 at ¶¶ 11-12; Pl.'s Ex. 5 at 33-34; *id.* at 68-69 (testifying that under the PWC contract, Ms. Allen as COTR or the contracting

30

officer were required to be present for all discussions of PWC's performance on the contract); *id.* at 76-79 (testifying that the PWC contractors complained that Ms. Hill was giving them technical direction).  This strained communications between Ms. Allen and the contractors, which Ms. Hill then used as a justification for downgrading Ms. Allen's 2008 performance evaluation.  PX 1 at 15.  Ms. Hill's exclusion and interference with the contractors also put Ms. Allen in violation of the contract with PWC as only the COTR was authorized to communicate with PWC regarding contract requirements. Combined with the deprivation of necessary staffing, these actions made Ms. Allen's job more arduous.  As such, summary judgment on this issue must be reversed.

### III.    A Reasonable Jury Could Find That Ms. Hill Acted with a Retaliatory Motive.

#### A.    A Reasonable Jury Could Find That Ms. Hill Began a Campaign to Undermine Ms. Allen Immediately After She Learned of Ms. Allen's Complaint of Retaliation.

It is well settled that temporal proximity between protected activity and adverse activity raises an inference of retaliatory motive.  *See Gleklen v. Democratic Congressional Campaign Committee*, 199 F.3d 1365, 1368 (D.C. Cir. 2000) (temporal proximity between protected activity and a subsequent adverse personnel action is sufficient to raise an inference of retaliatory motive); *Singletary v. District of Columbia*, 351 F.3d 519, 524-25 (D.C. Cir. 2003) (courts must

consider a plaintiff's "ongoing pursuit of protected activity" in determining

whether temporal proximity exists).  Here, Ms. Hill displayed retaliatory animus

less than three weeks after she first had knowledge that Ms. Allen had engaged in

protected activity.  Ms. Hill learned that Ms. Allen had settled her discrimination

claims against the Agency, including Ms. Hill's supervisor, on February 25, 2008

or a few days thereafter, when she was tasked with implementing its terms.  R. 37-

2, Hill Decl. at ¶ 42 (admitting that she learned of Ms. Allen's EEO activity in

February 2008 when she was tasked with providing Outstanding annual reviews);

R. 8-5, Ex. A (Settlement Agreement signed February 25 and 26, 2008).  Just two

and one-half weeks later, she completed those performance evaluations without a

narrative (in violation of Agency policy) and she attached a document to each

appraisal that was clearly labeled "ALAN BANOV & ASSOCIATES," effectively

announcing to anyone looking at Ms. Allen's reviews that the "Outstanding"

ratings were the product of litigation.  PX 10 (2005-2007 appraisals, signed March

18, 2008); PX 3 at 39; *id.* at 42 (Ms. Hill admitting this was not the regular way in

which performance reviews were done).  Ms. Hill not only refused to change the

reviews when Ms. Allen pointed out that the fax line advertised her EEO activity,

she falsely testified that Ms. Allen never brought the issue to her attention. PX 3 at

63-64, 66.  *But see* PX 9 at ¶ 2 (noting that she told Ms. Hill that the fax line

identified my EEO activity but that Ms. Hill did not respond); PX 6 (Jones

deposition) at 31 (recalling that Ms. Allen had concerns that the performance

reviews did not look like what she would have expected, and that these were "not

what a typical performance assessment would look like").  Then, in April, she

deprived Ms. Allen of necessary resources, and in June, she failed to respond or

timely submit a recommendation for training for Ms. Allen. In September, she

began excluding Ms. Allen from important meetings and undermining her

authority by meeting with her subordinates and contractors without her knowledge.


This pattern of antagonism began with the 2005-2007 appraisals (less than

three weeks after Ms. Hill learned of Ms. Allen's EEO settlement) and continued

through the 2008 Performance Appraisal and beyond.  Ms. Hill's display of

hostility– beginning less than three weeks after learning of Ms. Allen's EEO

activity and continuing through her 2008 performance appraisal-- could lead a

reasonable jury to believe that she was motivated by retaliation to downgrade her

2008 appraisal and to exclude her from meetings essential to her job.  *See*

*Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012) (measuring temporal

proximity between protected activity and manager's first step toward the adverse

action – ignoring plaintiff's request for information about a detail – and concluding

that the two month period was short enough to raise an inference of retaliation);
*Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003) ("Evidence of
discriminatory or disparate treatment in the time period between the protected
activity and the adverse employment action can be sufficient to show a causal
connection."); *Kachmar v. Sunguard Data Systems, Inc*., 109 F.3d 173, 177 (3d
Cir. 1997) ("evidence of a 'pattern of antagonism' following the protected conduct
can also give rise to the inference [of retaliation].").

> **B.** **A Reasonable Jury Could Infer from the Late Appearance of Any Substantive Reasons for Excluding Ms. Allen from Essential Meetings That Ms. Hill Was Motivated by Retaliation.**

A reasonable jury can infer from the late appearance of the Agency's
explanation for excluding Ms. Allen from meetings on projects she directed, that
the reasons are "post-hoc rationales," for avoiding and punishing an EEO
complainant. *EEOC v. Sears Roebuck and Co.* , 243 F.3d 846, 853 (4th Cir. 2001).
At Ms. Hill's deposition, counsel repeatedly asked Ms. Hill for a substantive
explanation for why she excluded Ms. Allen from meetings on the IPIA project and
the A-123 internal control testing at her deposition.  Despite repeated attempts by
counsel, Ms. Hill gave no explanation for her actions: "because its my discretion
on who I have at the meetings," PX 3 at 129, and "because I made that decision,"
*id.* at 133 and finally, "I don't know."  *Id.* at 137.  Then, when Defendant filed its

motion for summary judgment ten months later, Ms. Hill signed a declaration with several detailed explanations that she had not mentioned at her deposition. *See* R. 37-2, Hill Decl. at ¶ 35 (acknowledging that she said "I don't know" why Ms. Allen wasn't included in certain meetings at her deposition, but claiming that "on further reflection" it was because it was "a high level initial organization meeting to initiate a process that would ultimately involve Ms. Allen's group"); *see also id.* at ¶¶ 36, 29 -41 (providing new, specific reasons for her failure to include Ms. Allen in meetings related to the Senior Assessment Team, meetings with the PWC contractors on the A-123 internal controls testing, meetings with IT regarding products produced by PWC, and with the DHS director for internal controls). Because Ms. Hill did not articulate these reasons until years after she took the actions, a reasonable jury could conclude that they are a pretext for retaliation. *See Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813 (10th Cir. 2000) ("We are disquieted ... by an employer who 'fully' articulates its reasons for the first time months after the decision was made."); *see also Czekalski v. Peters*, 475 F.3d 360, 367 (D.C. Cir. 2007) ("subsequent clarifications represented nothing more than back-pedaling").

**C.    A Reasonable Jury Could Reject Ms. Hill's Reasons for Downgrading Ms. Allen's 2008 Performance Appraisal and Find That She Is Covering up a Retaliatory Motive.**

35

Ms. Hill provides several explanations for downgrading Ms. Allen's performance on her 2008 performance review, all of which may be rejected by a jury. First, she claims that Ms. Allen failed to collaborate effectively with BFC. As the BFC was the subject of the audit, it was neither proper nor expected for Ms. Allen to collaborate with them on the audit findings. PX 9 at ¶ 4. Thus, Ms. Hill's reason is "unworthy of credence" and not legitimate. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (an employee may demonstrate pretext "by showing that the employer's proffered explanation is unworthy of credence.").

Second, Ms. Hill alleges that Ms. Allen's "lack of oversight and coordination with PWC contractors" caused delays in the Test of Operating Effectiveness. A jury could readily reject this explanation. As Ms. Allen has attested, the delays in the Test of Effectiveness were due directly to a significant expansion in the scope of the project. PX 9 at ¶ 5. In addition, Ms. Hill never told Ms. Allen that she needed to increase her oversight and coordination with PWC contractors. Indeed, in this litigation, Ms. Hill now claims that there was no need for Ms. Allen to be present at Ms. Hill's regular meetings with PWC because Ms. Allen was sufficiently updated by them on their progress on the project in which she acted as COTR. R. 37-2, Hill Decl. at ¶ 39.

Third, Ms. Hill claims that she could not rate Ms. Allen's work on the IPIA testing highly because there was a "lack of coordination with the finance centers to ensure they were performing the improper payment testing correctly and if they were receiving documents timely." PX 1 at 15. In addition to the fact that this alleged lack of coordination was never mentioned during the rating period, this accusation could be rejected by a jury based on Hill's effusive praise of Ms. Crane's work on the IPIA testing, given that Ms. Crane bore primary responsibility for coordination with the finance centers on the testing. In addition, a jury could reject as deceptive Hill's claim that she merely deferred to Allen's judgment in rating Crane as "Achieved Excellence" for her IPIA work and credit Allen's testimony that Hill in fact advocated for the high rating as well as a "nice bonus" for Crane. *See* PX 9 (Allen Decl.) at ¶¶ 8-9; *Brady*, 520 F.3d at 495 n.3 ("further evidence of discrimination" includes evidence "that the employer is making up or lying about the underlying facts that formed the predicate of the employment decision"). Having rejected Hill's explanation, a jury could conclude that she is dissembling to cover up a retaliatory motive toward Allen.

### D.  A Reasonable Jury Could Infer Retaliation From Ms. Hill's Failure to Follow Procedures Designed to Ensure Fairness and an Opportunity to Improve.

An employer's failure to follow its own established procedures, particularly

37

those designed to ensure fairness, may cast doubt on an employer's asserted reason for an employment decision. *Brady*, 520 F.3d at 495 n. 3; *Farris v. Clinton*, 602 F.Supp.2d 74, 87 (D.D.C. 2009) ("A defendant's failure to follow established criteria or procedures can cast doubt on its asserted legitimate, nondiscriminatory reason for not hiring the plaintiff."); *Walker v. England*, 590 F.Supp.2d 113, 142 (D.D.C. 2008) ("The failure to follow an employer's established procedures, particularly those designed to ensure fairness in a selection process, may be evidence of pretext.").  Here, the Agency's established procedure is to hold a mid-year review for every employee.  PX 7 (Keenan deposition) at 36-37 (testifying that the Agency expected him and his managers to provide mid-year ratings).  The purpose of the mid-year review is to ensure fairness in the ratings.  In this case, a mid-year review would have ensured fairness in the performance review process, if, as Ms. Hill claims, Ms. Allen's performance had truly been deficient.  Yet, Ms. Hill declined to give Ms. Allen a mid-year review.  Furthermore, Ms. Hill failed to give Ms. Allen feedback on her alleged performance deficiencies throughout the year.  A reasonable jury could conclude from Ms. Hill's failure to provide a mid-

year review or any feedback on Ms. Allen's performance that Ms. Allen's performance was not deficient, that Ms. Hill wanted to hide that fact by not commenting on her performance before the annual appraisal, and/or that she had no reason other than retaliation for later alleging that Ms. Allen's performance was in any way deficient.  As such, summary judgment is inappropriate.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that District Court's grant of summary judgment be reversed.

Respectfully Submitted,

David H. Shapiro (D.C. Bar No. 961326)
Ellen K. Renaud (D.C. Bar No. 479376)
SWICK & SHAPIRO, P.C.
1101 15th Street, N.W., Suite 550
Washington, DC 20005
Tel. 202-842-0300
Fax 202-842-1418
dhshapiro@swickandshapiro.com

Attorney for Plaintiff

39

## CERTIFICATE OF COMPLIANCE

The text for this Appeal Brief is prepared using Times New Roman, 14

point, and contains  8,936   words as counted by Corel Word Perfect.

Ellen K. Renaud

## CERTIFICATE OF SERVICE

I certify that a copy of this Appeal Brief was served to Appellee's counsel

or record on February 6, 2014 by CM/ECF electronic notification.

Ellen K. Renaud

40